18964

L. B. REDMAN, Administrator of the Estate of Edward B. Redman, Respondent, v. FORD MOTOR COMPANY, Inc., Appellant

(170 S. E. (2d) 207)

*Messrs. Paul A. Sansbury,* of Darlington, and *Wright, Scott, Blackwell & Powers,* of Florence, *for Appellant,*

*Messrs. James P. Mozingo, III,* and *Greer & Chandler,* of Darlington, and *Edward E. Saleeby,* of Hartsville, *for Respondent,*

Sept. 25, 1969.

LITTLEJOHN, Justice.

The plaintiff brought two actions: one for wrongful death, and the other for pain and suffering, damage to property, and funeral expenses under the survival statute. The two actions were tried together by consent. This appeal involves, and the exceptions apply to, both cases. The plaintiff is the administrator of the estate of his deceased son who, while driving an automobile manufactured by the defendant, Ford Motor Company, was killed in a one-car accident. The jury returned verdicts for actual damages for the plaintiff in both suits. Post-trial motions for judgment *non obstante veredicto* and for a new trial were overruled by the presiding judge, and the defendant appealed. In its appeal the defendant challenges the admissibility of certain expert testimony and the sufficiency of plaintiff's evidence on the question of negligence.

Plaintiff's complaint alleged that his intestate purchased a new 1958 Ford automobile on March 14, 1958; that on March 22, 1958, while the intestate was driving the automobile on U. S. Highway 52 north of Darlington, South Carolina, one of the rear wheels suddenly came loose and the left rear axle shaft came out, causing the automobile to become uncontrollable and to roll and turn over with the intestate inside; and that the intestate was fatally injured thereby. It was alleged that the defendant failed to use due care in the manufacture of the automobile and that such negligence, carelessness, and willfulness on the part of the defendant was the proximate cause of the injury and death of the plaintiff's intestate.

By answer the defendant (1) interposed a general denial, (2) alleged sole negligence, recklessness, and willfulness on the part of plaintiff's intestate, and (3) plead contributory negligence, recklessness, and willfulness on the part of plaintiff's intestate.

The one-car accident occurred while the deceased was traveling alone between midnight and two o'clock A.M., and

when the automobile was only eight days old and had been driven 644 miles. The automobile was completely demolished as a result of its having apparently turned over several times.

The point at which the car was found was approximately the beginning of a substantial curve to the right for traffic traveling north from Darlington. The car was found lying on its side about 25 feet from the paved surface of the highway, and the unrecognizable body of the deceased was several feet from the car. The weather was clear, the highway was dry, and there were no skid marks on the road. There was a ditch approximately eight to ten feet from the highway which the Redman car presumably crossed. The highway patrolman who investigated the accident stated that the distance between a point on the right side of the road "where it looked like a car had gone off the road" and the place at which the car had come to rest on the left side of the road was 400 feet. There were marks of some kind indicating the line of travel of the car, but no skid marks. There were no eyewitnesses to the accident.

Circumstantial evidence was relied on heavily by the plaintiff to prove negligence on the part of the defendant. The basic contention of the plaintiff was that the left rear axle shaft and wheel assembly became disengaged from the car and caused it to become uncontrollable to such an extent that it ran off the highway and overturned. The plaintiff contended further that an axle shaft would not come loose and separate from its anchorage while in operation if it was manufactured, assembled, and inspected properly.

Mr. Motte Pearce, a wrecker service operator who arrived at the scene shortly after the accident, testified that the left rear wheel assembly and axle were loose and dangling from the car outside the fender well. The axle was not broken, but was bent at an angle of approximately 30°. He said that he lifted the loose assembly and axle out of the axle housing and placed them in the car. The car was then taken to his junk yard and put under lock and key, but the

assembly and axle disappeared a couple of days later. This disappearance was never explained.

Both the investigating officer and Mr. Pearce testified that the emergency hand brake on the automobile was pulled all the way up into the "on" position. Mr. Pearce testified that sometime after dawn he examined the left rear wheel braking mechanism and found the brake shoes had expanded well beyond the point to which they could have expanded if the wheel drum had been in its normal position when the brake was applied.

As a part of his circumstantial evidence case, the plaintiff relied heavily on the deposition testimony of V. D. Ackerman, whose opinion testimony was admitted by the lower court. Three of the questions raised by the defendant on this appeal relate to Mr. Ackerman's testimony.

The first challenges the entire deposition and the deponent's qualifications as an expert in the field of automobile mechanics. It is argued that his background and qualifications are not such that his testimony should be considered as that of an expert. The adequacy of a witness's qualifications as an expert is largely a matter of discretion for the trial judge. *Parks v. Morris Homes Corp.,* 245 S. C. 461, 141 S. E. (2d) 129 (1965). Mr. Ackerman testified that he was 71 years of age and had been actively engaged in the field of automotive mechanics for more than 50 years. He stated that he was a member of the Society of Automotive Engineers and the Automotive Engine Rebuilders Association of America; that he had served as repair and maintenance manager for two large transportation services in the United States; and that many thousands of pressure-fitted axles and bearings, including those for 1958 Fords, had been disengaged under his supervision. He further testified that this procedure for the bearings on axles is and has been for many years the standard one for all American cars, regardless of the make.

> Although the witness admittedly had never removed the bearing from the axle of a new 1958 Ford automobile, a reading of the testimony permits no doubt

that Mr. Ackerman possesses knowledge, skill, and information acquired by study, investigation, observation, practice, and experience about the construction, fitting and utilization of axles and bearings not likely possessed by the ordinary juror. We, therefore, find no abuse of discretion in the trial judge's ruling that Ackerman could testify as an expert on the matters at issue in this case referred to in more detail later.

After the trial judge refused to exclude the deposition of Mr. Ackerman in its entirety on the ground, among others, that he was not qualified as an expert, counsel objected from time to time as the deposition was presented to the jury to various parts of the tesimony, some of which objections were sustained, but most of which were over-ruled. The alleged errors on the part of the trial judge are summarized in two questions posed in the defendant's brief. One is the contention that Ackerman's testimony should have been excluded because it "contained conclusions that were conjectural and speculative," and the other is that it contained "conclusions as to the very issue to be decided by the jury, and, therefore, invaded the province of the jury."

In order to consider these questions it is necessary first to describe the functional parts of the left rear axle, bearing, bearing inner retainer, brake, and wheel mechanism, and their assembly and operation. The evidence of the plaintiff and defendant as to this is not substantially different.

The tire, wheel, and drum are mounted on the cylindrical part called the base plate which is built into and is part of the end of the axle. The axle is approximately 30 inches long, about one inch in diameter, and is obviously made of a hard, durable metal. The other end of the axle away from the wheel has splines which, when the axle is seated, slip into the axle housing and engage the differential gears which are located in a compartment (approximately in the middle of the car between the two rear wheels) called the differential. The bearing first and then the bearing inner retainer are slipped over the splined end of the axle and

along the axle to a point about two or three inches from the hub or base plate on the outer end of the axle. The size of the axle at that point is gradually enlarged so that force is required to wedge the bearing and the bearing inner retainer onto the axle with what is referred to as an interference fit. The diameter of the axle shaft at that point is slightly larger than the diameter of the inner race of the bearing and of the hole in the inner retainer. In order to force the bearing and retainer onto the axle and make them for all intents and purposes an integral part thereof, a hydraulic ram press applies pressure and pushes them down over the circumference of the shaft. Defendant's representative from the Ford factory testified that a pressure of a maximum of 6,000 pounds and a minimum of 2,000 pounds was required. He testified that if more than 6,000 pounds was required, or less than 2,600 pounds of pressure were sufficient to seat the bearing, the assembly was not used and was rejected.

After the bearing and bearing inner retainer are forced onto the axle under high pressure, the splined end of the axle is inserted into the axle housing and engaged by the differential gears. A bearing outer retainer between the bearing and the hub is then bolted to the axle housing phalange. The axle is thus held in place because the bearing and bearing inner retainer which are now an integral part of the axle are held in position by the bearing outer retainer.

In normal operation power is transferred from the motor by the drive shaft to the differential, which then transfers the power through gears to the splined end of the axle, causing the axle and inner race of the bearing along with the wheel to turn.

In order to remove a bearing and/or inner retainer from an axle after it has been forced on, much greater pressure is required; sometimes as much as 70,000 pounds according to one witness.

It is the contention of the plaintiff that the left rear axle of the plaintiff's intestate's 1958 Ford was undersized so that after being used for only 8 days and 644 miles it became disengaged from the bearing and bearing inner retainer instead of remaining as an integral part thereof. It is further contended by the plaintiff that when the axle became disengaged it slipped out of its seating, the splines left the differential gears, and the car started wobbling, went out of control, and overturned.

It is the contention of the defense that the car overturned, and, in its overturning, pressure was applied to the wheel and axle in such a way in which sufficient force to dislodge the axle from the bearing and inner retainer.

After the wreck the bearing outer retainer was still bolted to the axle housing and the bearing and the bearing inner retainer were still inside the axle housing.

Mr. Ackerman testified that the axle could become disengaged if it were smaller than the specifications required, or if the bearing were larger than specified. He testified that no type of accident could knock out an axle engaged according to specifications, and that such an axle would not become disengaged from the bearing in the ordinary use of an automobile over a period of 10 or 15 years. He stated that the only methods by which an axle could be disengaged would be to use the hydraulic press or an acetylene torch.

An engineer from Ford testifying for the deefnse stated that an axle would come out (1) because it was smaller in diameter than the diameter of the bearing and the inner retainer, or (2) because the bearing and inner retainer were larger in diameter than the diameter of the axle, or (3) because of a broken component, or (4) because of impact in use. His testimony was contrary to Ackerman's and was to the effect that an axle could be knocked out in an accident.

The regular braking system on the Redman car was the standard hydraulic system. Each wheel assembly has a

cup-like drum to which the wheel is secured, and inside of which is located the braking mechanism. The breaking system consists of a brake cylinder which fits just inside the drum. Inside the cylinder are two rubber encased pistons which are designed to apply pressure to the brake shoe in each wheel. This shoe is a circle of metal which surrounds the brake cylinder and is only slightly smaller than the wheel drum. The shoe has a brake lining riveted onto it which makes the actual contact with the wheel drum when braking is desired.

There is a line running from each wheel brake mechanism to a master brake cylinder in the front of the car. When the driver presses on the brake pedal, pressure is applied to the master cylinder. This forces fluid out of the master cylinder and into each of the four lines that run to the wheels. This fluid transfers the pressure to the pistons in each of the wheel braking mechanisms, and they push out against the brake shoes to which the linings are attached. The linings press against the inside of the wheel drums and create friction so that the rotation of the drums is stopped. As the wheels are attached to the drums, they stop turning and the car stops.

If a wheel drum is not surrounding one of the breaking mechanisms for some reason, all of the breaking power is lost. When the brake pedal is pushed and the fluid is forced out into the lines and thus into the wheels, the brakes are so designed that all four brakes will apply at the same time and with the same force. So if the brake drum is gone from one wheel the fluid will push the pistons in the wheel through the brake shoe and lining and all of the fluid will escape through the pistons. As the other three brakes will not be applied until the fourth is applied, there will be no pressure on any of the wheels and the car will be without the use of the hydraulic system.

The testimony is undisputed that there were no skid marks at the scene of the wreck, and that the brake linings were pushed out past the point they

could have gone if the wheel drum had still been in place when the brakes were applied. Mr. Ackerman's testimony is to the effect that the brake shoes would not automatically open out without pressure on the brake pedal. This was not objected to at the trial, but the defendant argues in its brief to this court that it is "obvious from the testimony that upon removal of the axle, with the attached drum, the brake shoes could fly or push out as though the brakes were applied." Because of this the defendant argues that Mr. Ackerman's testimony is conjectural. But this is based upon an erroneous assumption for it is not obvious from the record that the shoes could open out without application of pressure to the pedal. The only testimony put up by the defendant to contradict Mr. Ackerman was that of the expert from the Ford plant, who answered "I would think so" to a question about whether the shoes could expand without pressure on the brake pedal.

Mr. Ackerman testified further that he examined the 1958 Ford in question some 2 or 3 months after the wreck; that the left rear wheel bearing was still in the axle housing; that he measured the bearing carefully with an inside micrometer and found it to be within acceptable size tolerances; and that a minimum of 12 to 15 tons of pressure is required to disengage a properly seated bearing from the axle of a new car.

Ackerman was asked the following hypothetical question:

"Now, Mr. Ackerman, assuming that you have a 1958 Ford automobile with less than 1000 miles on it and assuming that that automobile is being operated on a normal public highway, and assuming that that car is found off the road in a wrecked condition, and assuming upon investigation that the axle shaft is disengaged and not present and not connected to the bearing connections, and assuming further that you made micrometer examinations of the bearings and found it in perfect condition and order and to perfect specifications, and assuming further that the examin-

ation indicates that the piston in the brake cylinder on the rear side of the car, where the wheel and axle is gone, is expanded or pushed out, then in your professional opinion what would be the reason for the axle shaft having become disengaged from that cylinder—from that bearing cylinder from the bearing?"

Mr. Ackerman then answered as follows: "Due solely to an undersized axle shaft."

The defendant argues that Ackerman's opinions and conclusions were conjectural and speculative in that his investigation of the physical facts was cursory at most, and that examination of the axle was made impossible by its untimely disappearance. In substance, the defendant argues that Ackerman's testimony is necessarily speculation that is based solely on the fact that the axle was found to be disengaged after the wreck.

After thorough examination of the numerous specific portions of testimony cited by the defendant on this question, we conclude, however, that the evidence admitted was something more than mere conjecture and speculation. Ackerman's testimony, beyond the description of objects and functions within his personal knowledge, was essentially the opinion that despite the tremendous forces at work in an automobile wreck and their unpredictability, it is extremely improbable that forces of sufficient intensity could be generated and applied in just the right places to effect disengagement of an axle from its bearing, particularly without breaking either the bearing or the axle housing. This opinion was based on extensive experience with the force required for disengagement, the manner in which this force must be applied, and, to a lesser extent, the damage to automobiles resulting from collisions. It can not be said that it was pure conjecture and speculation. The jury was entitled to consider the testimony.

The defendant urges the exclusion of parts of Ackerman's testimony in response to the hypothetical question on causation, on the ground that it is

a conclusion on the very issue before the jury and thus invades the jury's province. We have held, however, that the trial judge has the discretion to permit expert testimony on the ultimate issue before the jury. *O'Kelley v. Mutual Life Insurance Co.,* 197 S. C. 109, 14 S. E. (2d) 582 (1941) (opinion of medical expert on issue of disability in a disability insurance case). There is no invasion of the province of the jury, for the jury retains its power and duty to judge both the credibility of the witness and the weight to be given to his opinion. We find no abuse of discretion in the lower court's handling of the expert testimony of Mr. Ackerman.

The remaining three questions raised on this appeal relate to the sufficiency of the evidence to sustain the verdicts. Those questions as stated in defendant's brief are as follows:

"Was there proof of actionable negligence by the appellant Ford Motor Company?

"Was this an unavoidable accident as to appellant?

"Did the Trial Court err in refusing appellant's motions for nonsuit, directed verdict, judgment notwithstanding the verdict or for a new trial upon the ground that under the facts of this case liability could not be imposed upon appellant except under the doctrine of Res Ipsa Loquitur?"

In order to prevail and sustain a verdict plaintiff has undertaken to produce evidence which warrants the conclusion that the defendant placed in the automobile involved an undersized left rear axle and in so doing failed to use due care, and that such failure was the proximate cause of the injury and death of plaintiff's intestate. See *Mickle v. Ford Motor Co.,* S. C., 166 S. E. (2d) 173. In dispute is the factual issue of whether the axle slipped out, causing the wheel to wobble and the automobile to overturn, or remained engaged and was knocked out in the impact caused by the vehicle's overturning.

Witness Ackerman testified in effect that an axle could be disengaged from the bearing and inner bearing retainer only by a hydraulic press or an acety-

lene torch. The defendant's engineer testified that the axle could become disengaged by impact in use. The absence of skid marks indicate that the brakes on the vehicle were never effectively applied. The uncontradicted testimony shows that the hand brake, or emergency brake, which applies to the rear wheels only, was pulled to the full "on" position. The evidence further shows that the emergency brake is not effective on either rear wheel, unless the drums of both are in proper position at the time of application. The inference is thus created that the axle became disengaged and slipped out prior to the time the brakes were applied. It was for the jury to say what caused the axle to slip out and we cannot rule that the only reasonable inference to be drawn from the whole of the testimony is that the axle was knocked out by impact. The jury would have been warranted under the evidence in concluding that the impact disengaged the axle, but such is not the only reasonable inference. The issue of liability is admittedly a close one, but we think that issues of fact for the jury were raised and not issues of law alone.

Having concluded that jury issues of actionable negligence were raised, the last two questions involving the law of unavoidable accident and the issue of *res ipsa loquitur* need not be considered.

The lower court is

Affirmed.

Moss, C. J., and LEWIS, BUSSEY and BRAILSFORD, JJ., concur.