### 19415

Marvin R. BENFORD, Respondent, v. BERKELEY HEATING CO., and the Trane Company, of which The Trane Company is, Appellant.
(188 S. E. (2d) 841)

358

*Messrs. Charles H. Gibbs,* and *Thomas G. Buist, of Sink-ler, Gibbs, Simons & Guerard, P. A.,* Charleston, *for Appel-lant,*

*Messrs. Augustine T. Smythe,* of *Buist, Moore, Smythe & McGee,* Charleston, and *Thomas O. Berry, Jr.,* of *Parler, Berry & Prettyman,* Georgetown, *for Respondent,*

May 11, 1972.

BRAILSFORD, Justice:

Marvin Benford brought this action against Berkeley Heating Company and The Trane Company for the near-total loss of his new home in a fire caused by

the gas furnace. The jury absolved Berkeley Heating, which sold and installed their furnace, but returned a verdict against Trane, the manufacturer.[1] Trane appeals from the denial of its alternative motions for judgment *non obstante veredicto* or a new trial.

The furnace was installed in the crawl space beneath the house during August, 1967. A few days after the fire, which occurred on November 30, 1967, a mechanical engineer was engaged to ascertain its cause. He found that the furnace draft hood or vent, where the flue gases exit the furnace and enter the flue, was installed only 2¾ inches from the pine joist where the fire originated, although Trane's installation manual required a minimum clearance of 6 inches. This manual, which was delivered to Berkeley with the furnace, required that the flue pipe, which funneled exhaust gas to the chimney, be pitched upward so as to facilitate escape of the exhaust. Instead, Berkeley installed the flue with a downward slope. The manual specified that the connection from furnace to chimney be by a "short and direct route." The flue pipe as installed by Berkeley was 10 feet long and made 3 ninety degree turns. Finding nothing wrong with the furnace itself, which was of a standard design, tested and approved by the American Gas Association, the recognized authority in the field, and commonly sold under such trade names as Chrysler Air Temp, Carrier, Fedders Corp., Trane and many others, this expert concluded that its maladroit installation by Berkeley caused the fire. Relying upon these findings Benford sued Berkeley alone charging that its negligence caused his loss.

An article written by this engineer about the fire appeared in a trade magazine, American Artisan, July, 1968, in which it was stated that "(t)hree fatal errors characterized (the) installation" of the Benford furnace. The author summarized these in his testimony as being, "Inadequate clearance was

---

[1] Although the furnace was made by another company, Trane assumed the duties of a manufacturer when it labeled and sold the product as its own.

one error. Three 90 degree elbows in the vent connector was another. The third error was a down pitch of the vent connector to the chimney."

A further investigation of the cause of the fire was made for Benford by another mechanical engineer in February, 1969. He concluded from his examination of the components of the furnace that the blower had not operated during the fire, and found by testing that the blower switch would not operate. Armed with this and other information, Mr. Benford discontinued his Charleston County suit against Berkeley alone, in which the complaint had been twice amended, and commenced this action against Berkeley and Trane in Dorchester County. The complaint, dated April 22, 1969, alleged that as a result of the failure of the blower to operate, the temperature within the furnace became much higher than normal, and that this elevated temperature combined and concurred with the faulty installation by Berkeley to cause the fire. Recovery was sought on several theories, including negligence and implied warranty. Upon the conclusion of plaintiff's testimony, the court required plaintiff to elect upon what theory he would seek recovery; whereupon, plaintiff chose breach of implied warranty.

> The vendor is answerable for breach of implied warranty incident to a sale as for any breach of contract, "for whatever damages follow as a natural consequence and proximate result of his conduct, or which may reasonably be supposed to have been within the contemplation of the parties at the time the contract was made as a probable result of a breach of it." *National Tire & Rubber Co. v. Hoover,* 128 S. C. 344, 347-348, 122 S. E. 858, 859 (1924). *Hiers v. South Carolina Power Co.,* 198 S. C. 280, 17 S. E. (2d) 698 (1941).[2] Thus, the breaching party's liability normally extends only to "such consequences as would follow such a breach in the usual course of events." 11 S. Williston, Law of Contracts, Sec. 1344 (3d ed. 1968).

[2] Cf. UCC, Sec. 10.2-715, Code of 1962, which is not applicable to this sale.

The Restatement of Contracts, Sec. 330, contains an oft-quoted expression of the rule:

"In awarding damages, compensation is given for only those injuries that the defendant had reason to foresee as a probable result of his breach when the contract was made. If the injury is one that follows the breach in the usual course of events, there is sufficient reason for the defendant to foresee it; otherwise, it must be shown specifically that the defendant had reason to know the facts and to foresee the injury."

Despite the lapse of time after installation of the furnace and the intervention of the destructive fire before discovery that the blower switch would not operate, we are satisfied that the evidence was sufficient to support the finding, implicit in the verdict, that the switch was defective when it left Trane's hands. Without pausing to review the evidence on this point, we address the dispositive issue of whether the evidence raised a jury issue that Benford's loss by fire was a natural and foreseeable consequence of Trane's breach of implied warranty of fitness; that is to say, whether Trane could reasonably have foreseen the fire as a probable and natural result of the failure of the blower switch.

The Trane furnace of this type is designed to operate normally in the following manner. When the temperature falls below the thermostat setting, an electrical circuit is closed, which activates the gas burner. Heat from the burner warms a compartment called the heat exchanger. The rising temperature of air inside the heat exchanger induces a gradual twisting movement in a thermocouple called a helical spring. The movement of the helical spring causes a cam mounted on the end thereof to close the blower switch, thereby starting the blower, which propels air from the heat exchanger into the house through the ductwork. When the thermostat senses a return to the desired temperature, it breaks the circuit to the burner, shutting off the gas. Falling

temperature inside the heat exchanger soon persuades the helical spring to reverse its course, reopening the blower switch and stopping the blower.

If the blower switch fails to function, the normal heating cycle is ousted by the following sequence. The blower receives no signal to operate. The air inside the heat exchanger, instead of being expelled into the duct system by the blower, grows hotter as the burner continues to transmit heat to the heat exchanger. As the temperature rises in the heat exchanger, the helical spring obediently pursues its twisting course to a point where its cam closes a safety device called the limit switch. The limit switch, countermanding the unsatisfied thermostat, turns off the burner. The air inside the heat exchanger cools; the helical spring relaxes its pressure on the limit switch; the limit switch reopens; the burner ignites again; and the cycle repeats indefinitely. When operating in this way without benefit of the blower, the furnace is said to be "cycling on the limit switch."

When the furnace is cycling in this fashion, the draft hood, located where the flue pipe is connected to the furnace, reaches a much higher peak temperature than it does during normal operation. Instead of its usual range in the low three-hundreds, the temperature of the draft hood may reach 500-525°. The function of the limit switch is to prevent dangerous overheating whenever for any reason the blower is not operating.[3] A properly installed furnace may cycle on it indefinitely. When operating in this fashion, the heat reaching the house is greatly attenuated but may be sufficient to prevent pipes from freezing if the family is away when the blower fails. This is the reason the furnace is designed to cycle when the burner is cut off by the limit switch instead of remaining off indefinitely.

[3] The design of the furnace includes an additional back-up device known as the upper limit switch which takes over, and on which the furnace cycles, if the limit switch should fail. There is no contention that this occurred in this case.

The manufacturer of a gas-burning furnace for installation in close proximity to combustible material beneath a dwelling owes a duty of care in manufacture and design of its product commensurate with the danger involved. Here, there is no claim that the furnace was not properly designed, nor that the installation manual, which necessarily complemented the design and construction of the furnace, was inadequate. Plaintiff was emphatic at the trial that his sole claim against Trane was based upon the defective blower switch. His complaint as to installation was directed solely at Berkeley, and properly so.

Plaintiff is bound by his own evidence, and that of his expert witnesses, that Berkeley positioned the furnace with its draft hood less than three inches from combustible material instead af the mandatory six, and inclined the flue pipe downward three inches instead of upward two and one-half. According to plaintiff's own expert, the three elbows in the flue pipe and its faulty inclination impeded the exit of the flue gas, which approached 550° in temperature, forcing some of it to escape prematurely at the draft hood, where it may have heated the nearby joist convectively and caused it to ignite. In the absence of proof to the contrary, the inference is inescapable that Berkeley's patent disregard of proper installation procedure interrupted the normally foreseeable train of events linking manufacture with use. It would be against reason to assume that such maladroit installation, which plaintiff originally assigned as the sole cause of the fire, usually and naturally precedes the use of a furnace. Unless there was evidence reasonably pointing to conclusion that the defective blower switch alone would have caused the loss in natural course, the judgment must fall.

The respondent presented the two engineers already referred to as expert witnesses. One of them testified first that he was unable to say whether the defective blower switch would have caused the fire eventually, absent faulty installation. Later, he stated his assumption that it would not have done so, provided that the manufacturing standards of the

the American Gas Association, to which the furnace conformed, were properly formulated.

The respondent's other expert testified that he had initially attributed the fire to the downward inclination of the flue, together with the use of too many elbow joints in the flue and inadequate clearance between draft hood and joist. After learning of the defective blower switch, he included that as a contributing cause of the fire, which, of course, it was, in the sense that the failure of the blower caused the temperature of the flue gas to become elevated, and everyone concedes that heat from the draft hood ignited the joist. When questioned concerning the difference a six inch clearance would have made in the fate of the joist, he testified as follows:

"There are a great many factors involved in this so that I couldn't tell you offhand exactly what it would be, but you will have to assume a whole set of conditions in order to do that and because of the difficulty of getting a set of conditions which can be duplicated out of the field they express it this way. Whatever the rate of heat transferred this way shall not raise the heat (at the) surface toward the 90 degrees farenheit above the ambient; if it goes above that then you are in trouble." [4]

"Q. My question is suppose it was four inches or six inches, what difference would it have made insofar as whether you had a fire or no fire?

"A. It would make a difference of course.

"Q. That's the difference I want you to tell me about.

"A. I doubt if you could measure it in the space you are talking about; if you were trying to measure it between here

---

[4] The witness made no further explanation of or reference to his assertion that a sustained temperature ninety degrees above the ambient at the surface of the joist would produce ignition. Instead, he named a series of joist temperatures, the lowest of which was 356 degrees, required to produce ignition if sustained for specified times. He made no effort to explain how these figures would be influenced by the host of variables which he characterized as controlling, nor to correlate the temperature and proximity of the draft hood with the temperature of the joist.

and the wall or the back of this room you would get zero down there and something here, but if you are going to try to measure two or three inches difference you just don't do it, it won't show up. The difference is not enough.

"Q. Is the answer to my question it would not have made any difference?

"A. Yes, I said it would make some difference. I don't think it would make a significant difference, because there is not enough space." [5]

Although the witness dismissed as negligible the amount of heat transferred from draft hood to joist by convection, he later testified that malinstallation of the flue pipe and consequent "unfavorable draft balance" may have caused $550°$ flue gas to escape from the draft hood, thereby roasting the joist convectively.

At one point in his testimony, the witness testified that the joist eventually would have ignited at a distance of six inches. Since this conclusion was not made in response to a hypothetical question, and since the witness himself failed to state the assumptions which underlay his opinion, we think it to be without probative value on the crucial issue. For aught that appears, this opinion rested on the assumption that the downward slope of the flue pipe was continued, unremedied, as a contributing cause.

Moreover, the witness gave no opinion on how much additional time would have been required for ignition, absent

---

[5] The laws of physics and mathematics, together with generally accepted facts relating to natural forces, may be judicially noticed. 31A C. J. S. Evidence § 74 (1964). *Cf. Johnson v. Atlantic Coast Line Ry.*, 112 S. C. 47, 99 S. E. 755 (1919). We note that the net energy radiated between hot draft hood and cooler joist would vary with the distance between them in proportion to a variable factor dependent on the geometrical shape and juxtaposition of the two surfaces. See, *e.g.*, M. Jakob, Elements of Heat Transfer 221 (3d ed. 1957). The extent to which this factor diminishes as the distance between joist and draft hood increases from three to six inches is not precisely determinable from the facts in the record. Even under assumptions most charitable to the respondent, however, it is certain that substantially less radiant heat energy would have impinged on the joist at six inches than at three. More simply, anyone who has warmed his hands before a pot-bellied stove, or similar device, is aware that differences in proximity measured in inches dramatically affect the instensity of heat radiation.

faulty installation. Even with defective installation, to which this witness solely attributed the fire in his initial assessment, the elevated temperature at the draft hood required a month or better to bring the joist to ignition. Certainly, the Benfords could not have gone far into the winter season with a substantially inoperative furnace before realizing that something was amiss and calling for a service check.

We find the record devoid of any evidence from which the jury reasonably could have concluded that the fire would have occurred in natural course, absent unforeseeably faulty installation by the defendant Berkeley.

Furthermore, the designer of the furnace recognized, that, for any of a number of reasons, including a clogged filter, the blower could not be counted upon to always perform its function. Consequently, the furnace was designed to cycle safely on the limit switch when properly installed and, in case of the failure of that switch to cut off the flow of gas, to cycle safely on the upper limit switch. Any evidence that the furnace cycling on the limit switch would have caused the fire, even if it had been installed in the manner directed by the manual, would have pointed to a defect in design as the cause of the fire, which is not charged as a ground of recovery.

We note that much of the charge to the jury was in the tort terminology of proximate, concurring and intervening causes, to which no exception was taken. If this be regarded as the law of the case, the result is the same.

For the reasons stated, the only reasonable inference from the evidence is that the intervening independent negligence of Berkeley was not reasonably foreseeable by Trane and that the destruction of plaintiff's house was not a natural and probable result of the failure of the blower switch. Trane's motion for judgment *non obstante veredicto* should have been granted.

Reversed.

Moss, C. J., and Lewis, Bussey and Littlejohn, JJ., concur.