732 S.E.2d 635

**Travis A. RODDEY, as the personal representative of the Estate of Alice Monique Beckham Hancock, deceased, Appellant,**

v.

**WAL–MART STORES EAST, LP, U.S. Security Associates, Inc., and Derrick L. Jones, Respondents.**

Appellate Case No. 2010–163426.

No. 5028.

Court of Appeals of South Carolina.

Heard April 10, 2012.
Decided Aug. 29, 2012.
Rehearing Denied Oct. 18, 2012.

John S. Nichols and Blake A. Hewitt, Bluestein, Nichols, Thompson & Delgado, LLC of Columbia; S. Randall Hood and William A. McKinnon, McGowan, Hood & Felder, LLC, of Rock Hill; and Brent Paul Stewart, Stewart Law Offices, LLC, of Rock Hill, for Appellant.

W. Howard Boyd, Jr. and Stephanie G. Flynn, Gallivan White & Boyd, PA of Greenville, for Respondents.

**FEW, C.J.**

Alice Hancock died in an automobile crash as she drove away from the Wal–Mart in Lancaster. She was being chased by Derrick Jones, an employee of U.S. Security Associates, Inc., which provided security in the Wal–Mart parking lot pursuant to a contract with Wal–Mart. Wal–Mart management had advised Jones that a passenger in Hancock's vehicle

attempted to steal merchandise from the store, and they instructed him to get the vehicle's license tag number. At trial, the court directed a verdict for Wal–Mart, and the jury returned a defense verdict on the claims against Jones and U.S. Security. Hancock's estate appeals the decision to direct a verdict in favor of Wal–Mart. We affirm.

## I. Facts and Procedural History

On the night of June 20, 2006, Hancock drove to Wal–Mart with her sister, Donna Beckham. Hancock entered the store with Beckham but later returned to her vehicle in the parking lot. While Hancock waited in the car, Beckham attempted to shoplift several items from the store by placing them in plastic bags. As Beckham testified at trial, "I then went and got a bag and went and put some pants into the bag[.] I shouldn't have done it." [1]

Hope Rollings, one of the store's customer service managers, saw Beckham do this. Rollings alerted fellow manager Shaun Cox and several other employees that Beckham was attempting to steal merchandise. Rollings then walked outside to speak with Jones, who was on duty in his company truck. As Rollings and Jones spoke, Cox used a handheld radio to tell them that Beckham was headed towards one of the exits. Rollings went back inside, and Jones drove to the exit. Jones testified he asked over the radio what he should do, as he did not have the authority to detain Beckham. He was told to "try to delay her. Try to talk to her until we can get out there."

As Beckham approached the exit with the bags of merchandise, a Wal–Mart greeter asked to see her receipt. Beckham told the greeter Hancock had the receipt in the car. She testified, "I told her that my sister had it but that was a lie." Beckham then put down the bags and walked out of the store. Jones saw Beckham and spoke to her briefly. Beckham

---

1. Beckham also testified:

 Q: And you elected not to leave with [Hancock] because you were attempting to take clothing from the store, correct?

 A: Couple of pair of jeans, yes.

 Q: There's no question, Ms. Beckham, you had absolutely no intention of paying for the clothing items that night, did you?

 A: No, sir.

testified Jones screamed at her. Beckham began running towards Hancock's car. Jones followed her in his truck but did not physically detain her. Hancock saw Beckham, pulled out of her parking space, and drove down a lane of the parking lot towards Beckham. Jones drove into the lane, blocking Hancock's vehicle. While Hancock's car was still moving, Beckham jumped into the back seat.[2] As Beckham later testified, she told Hancock to "get them the hell out of here." Hancock put her car in reverse, backed up at a high speed, struck a median in the parking lot, turned around, and drove towards the exit of the parking lot. Jones followed behind her.

As these events unfolded, Cox walked to the main entrance of the store and radioed to Jones, "Get her tag number." According to Jones, he received instructions over the radio from Cox and Rollings to get the license tag information from Hancock's vehicle. Jones testified, "And I'm on the walkie-talkie, telling them, I can't see this license plate tag number, and they're about to leave the parking lot." A Wal–Mart employee replied, "Man, well, you got to do what you got to do. You need to get that license plate number." These instructions by Wal–Mart personnel violated Wal–Mart's policy for investigating and detaining suspected shoplifters, which provided:

NEVER pursue a fleeing Suspect more than approximately 10 feet beyond the point you are located when the Suspect begins to run to avoid detention. Ten feet is about three long steps. This limitation applies both inside and outside the facility.

NEVER pursue a Suspect who is in a moving vehicle.

NEVER pursue a Suspect off the Facility's property.

NEVER use a moving vehicle to pursue a Suspect.

TERMINATE the pursuit of a Suspect, if the Suspect begins to enter a vehicle.

LET THE SUSPECT GO, rather than continue a pursuit that is likely to injure or cause harm to someone.

---

2. The word "jump" comes from the testimony of Roddey's expert Jeffrey Albert, who used the word to describe what he observed in the video of Beckham leaving the Wal–Mart and entering Hancock's car.

As Hancock left the parking lot and drove onto a highway, she ran a stop sign and a stop light, nearly getting into an accident. In violation of his training and U.S. Security policy, Jones left the parking lot and pursued Hancock and Beckham onto the highway. According to Jones, Hancock drove up an onramp, "almost slamm[ing] into the back of another lady's car" and missing it by swerving to the left. Jones testified he lost Hancock and Beckham at that point, and he did not find them again until he saw her vehicle's hazard lights flashing off of the side of the road. However, Beckham testified Jones stayed close behind them. Crouching in the back seat, she periodically looked up over the seat and saw Jones driving "on [their] bumper" and flashing the high-beams on his truck. After about two miles, Hancock told Beckham "he's still on our ass," and then Beckham heard and felt a bump. Hancock's car left the road and crashed. Hancock died at the scene.

Travis Roddey, the personal representative of Hancock's estate, sued Wal–Mart, U.S. Security, and Jones for negligence. At trial, the court granted Wal–Mart's motion for a directed verdict. The jury found Hancock was 65% at fault and U.S. Security and Jones were 35% at fault. Roddey filed a motion under Rule 59(e), SCRCP, seeking a new trial as to all defendants on the basis that the court erred in directing a verdict for Wal–Mart. The court denied the motion.

## II. How the Panel Votes to Affirm

Wal–Mart asserted three grounds for its directed verdict motion: (1) Roddey presented no evidence Wal–Mart breached its duty of care; (2) Wal–Mart's actions were not the proximate cause of Hancock's death as a matter of law because Jones' and Hancock's actions were not foreseeable; and (3) Hancock's fault in causing her own death was more than 50% as a matter of law. The trial court granted the motion on the first two grounds, stating "I . . . find that there is insufficient evidence that Wal–Mart was negligent, or even if [it was] there is a lack of proximate cause [in] that the events were not foreseeable." As to the third ground, the court stated it was "[un]able to find as a matter of law that Hancock was more than 50 percent [at fault]."

Judge Huff and I believe the trial court erred in finding there was insufficient evidence of Wal–Mart's negligence and in finding Jones' and Hancock's actions were not foreseeable. However, I vote to affirm because I believe Hancock was more than 50% at fault. As Judge Short explains in his concurring opinion, he votes to affirm because he believes the trial court correctly found no proximate cause as a matter of law. As Judge Huff explains in his dissent, he would reverse and remand for a new trial as to Wal–Mart.

### III. Evidence of Wal–Mart's Negligence

 Cox and Rollings' instructions that Jones get the tag number of Hancock's vehicle, including the command "do what you got to do," violated the Wal–Mart policy designed to prevent injuries and deaths caused by fleeing suspects. A defendant's violation of its own safety policies is some evidence of negligence. *See Madison ex rel. Bryant v. Babcock Ctr., Inc.*, 371 S.C. 123, 140, 638 S.E.2d 650, 659 (2006) (stating a defendant's standard of care in a negligence action "may be established and defined by . . . a defendant's own policies and guidelines"); *Peterson v. Nat'l R.R. Passenger Corp.*, 365 S.C. 391, 397, 618 S.E.2d 903, 906 (2005) (holding "evidence of [a defendant's] deviation from their internal maintenance policies is admissible to show the element of the breach"); *Tidwell v. Columbia Ry., Gas & Elec. Co.*, 109 S.C. 34, 35, 95 S.E. 109, 109 (1918) (stating "violation [of a defendant's rules] was evidence tending to show negligence"); *Caldwell v. K–Mart Corp.*, 306 S.C. 27, 31, 410 S.E.2d 21, 24 (Ct.App.1991) (stating a jury may consider violations of internal policies or self-imposed rules as evidence of negligence). Therefore, the trial court should not have directed a verdict on the basis that there was insufficient evidence of negligence.

### IV. Foreseeability of Hancock's Actions

 The purpose of Wal–Mart's policy is to prevent injury or death resulting from negligent or reckless driving in pursuit of a suspect. The policy states: "LET THE SUSPECT GO, rather than continue a pursuit that is likely to injure or cause harm to someone. . . . Remember to put people first. Protecting the physical well-being of Suspects . . . is your first priority." Similar instructions and reminders to "put people

first" appear throughout the policy. The danger sought to be prevented by this policy arises from the anticipated negligent or reckless driving of the pursuer and the pursued. Therefore, the danger that a fleeing suspect or the security officer chasing her might drive negligently or recklessly and injure the suspect or someone else is not simply foreseeable—it is the very reason Wal–Mart adopted the policy in the first place. I disagree that Jones' and Hancock's actions were not foreseeable to Wal–Mart.

## V. Hancock's Fault

There are two reasons this court should hold that Hancock was more than 50% at fault and on that basis affirm the directed verdict in favor of Wal–Mart. First, the jury's factual determination of how fault should be apportioned between Hancock, Jones, and U.S. Security is binding on Roddey even though Wal–Mart's actions were not included in the jury's analysis. Second, the trial court should have directed a verdict for Wal–Mart on the ground that Hancock was more than 50% at fault as a matter of law.

### a. Effect of the Jury's Apportionment of Fault

In his post-trial motion, Roddey stated his theory of the case is that the "car accident was due less to the decedent's actions and more to (1) Wal–Mart's decision to encourage Derrick Jones to chase the decedent by vehicle, and (2) Jones' actions during the chase—flashing his lights and driving on the decedent's bumper." The specific allegations in Roddey's complaint were that Wal–Mart was liable in three ways: (1) it was vicariously liable for Jones' actions; (2) it failed to properly supervise Jones; and (3) it "improperly advised or instructed" Jones to follow Hancock and obtain her license tag information.[3] None of these allegations can possibly result in liability against Wal–Mart, now that the jury has found Hancock to be 65% at fault in the accident.

With respect to the first allegation, Roddey claims Jones was Wal–Mart's agent, and therefore Wal–Mart is vicariously liable for his conduct. Roddey's right to recover

---

3. The complaint is not in the record on appeal. Roddey described his allegations in one of his briefs to this court.

from Wal–Mart under this claim depends entirely on whether Jones was liable. In other words, because Wal–Mart's liability is derivative of Jones' liability, the jury's finding that Jones was only 35% at fault forecloses the liability of Wal–Mart.

Roddey's other two allegations involve acts and omissions by Wal–Mart. Roddey argues that because the jury apportioned fault only between Hancock, Jones, and U.S. Security, Wal–Mart's conduct, if considered by the jury, could have reduced Hancock's proportion of fault to the point that her negligence was not greater than that of all the defendants. *See Nelson v. Concrete Supply Co.*, 303 S.C. 243, 245, 399 S.E.2d 783, 784 (1991) ("If there is more than one defendant, the plaintiff's negligence shall be compared to the combined negligence of all defendants."). In many cases involving multiple tortfeasors, the negligence of a tortfeasor absent from the case could affect the relative fault of the plaintiff. In this case, however, Wal–Mart's conduct cannot reduce Hancock's proportion of fault.

The jury's comparison of fault necessarily involved an examination of the actions taken by the two participants in the chase—Hancock and Jones—and a determination of how their actions contributed to Hancock's death. Evidence was presented that Hancock drove through the parking lot towards Beckham as she ran from the store, did not stop the car as Beckham jumped into it, backed up in the parking lot at a high rate of speed, hit a concrete median, ran a stop sign and a stop light as she turned onto a public highway, swerved through traffic, and narrowly avoided two collisions with other cars.[4] There was also evidence that Jones blocked Hancock's car, pursued her through the parking lot, left his assigned area, followed Hancock's car onto the highway, drove "on [the] bumper" of Hancock's car on the highway, flashed his headlights, and possibly made contact with Hancock's car. Whatever Jones' and Hancock's motivation may have been for taking those actions, it was the actions themselves that proximately caused the crash that killed Hancock. The jury al-

---

4. Because I am explaining evidence the jury considered in its apportionment of fault, I do not view the evidence described in this sentence in the light most favorable to Roddey. In all other portions of the opinion, I have described the evidence in the light most favorable to Roddey.

ready considered all of those actions, and it determined Hancock's actions made her 65% at fault.

Even under Roddey's theory of the case, Wal–Mart's conduct merely provides some explanation of what motivated Jones' actions. Wal–Mart's negligence could affect how much of the remaining 35% of fault is attributable to Jones, for if Jones was motivated by Wal–Mart's improper actions, arguably he would bear less of the fault for Hancock's death. However, Wal–Mart's actions can have no effect on Hancock's fault. Wal–Mart obviously did not advise or instruct Hancock to flee, nor did it enable her actions by failing to adequately supervise her. There is no evidence in the record that Hancock knew anything about what Wal–Mart told Jones. Therefore, Wal–Mart's alleged conduct could not have reduced Hancock's proportion of fault in the way it could have reduced that of Jones. Even if the jury had been permitted to consider Wal–Mart in its apportionment of fault, Wal–Mart's conduct could not have affected the jury's determination that Hancock was 65% at fault.

Because Wal–Mart's conduct could not have reduced Hancock's fault, Roddey is bound by the jury's finding that she was 65% at fault, and the trial court's decision to grant Wal–Mart a directed verdict could not have prejudiced Roddey. Therefore, I believe we must affirm. *See O'Neal v. Carolina Farm Supply of Johnston, Inc.*, 279 S.C. 490, 497, 309 S.E.2d 776, 780 (Ct.App.1983) (affirming directed verdict without deciding whether trial court erred because jury's verdict made error harmless).

### b. Hancock's Fault as a Matter of Law

I would also affirm on the basis that no reasonable jury could have concluded Hancock was 50% or less at fault. *See Erickson v. Jones Street Publishers, L.L.C.*, 368 S.C. 444, 463, 629 S.E.2d 653, 663 (2006) ("The appellate court must determine whether a verdict for a party opposing the motion would be reasonably possible under the facts as liberally construed in his favor."); *Bloom v. Ravoira*, 339 S.C. 417, 422, 529 S.E.2d 710, 712–13 (2000) (stating a plaintiff in a negligence action "may only recover damages if his own negligence is not greater than that of the defendant"). Beckham testified Hancock "had no idea I was going in there to steal." However,

the evidence is overwhelming that once Beckham "jumped" into the back seat of Hancock's moving car, Hancock was aware that she was fleeing a crime scene. Rather than testifying Hancock did not know they were fleeing the Wal–Mart, Beckham testified she commanded Hancock to "get them the hell out of here." Viewing all the evidence in the light most favorable to Roddey, no reasonable jury could have concluded Hancock's fault was not greater than the fault of the defendants, even including Wal–Mart. *See Bloom,* 339 S.C. at 424, 529 S.E.2d at 714 ("Any factual issues which might exist as to Ravoira's fault in this accident cannot alter the inescapable conclusion that, as a matter of law, Bloom's fault exceeded fifty percent."). Therefore, even though the trial court did not grant the motion for directed verdict on this basis, I would affirm. *See* Rule 220(c), SCACR ("The appellate court may affirm any ruling, order, decision or judgment upon any ground(s) appearing in the Record on Appeal.").

## VI. Conclusion

The trial court's decision to direct a verdict in favor of Wal–Mart is **AFFIRMED.**

SHORT, J., concurs in a separate opinion.

HUFF, J., dissents in a separate opinion.

SHORT, J., concurring in a separate opinion.

I agree the trial court's order should be affirmed. I write separately because I would decline to rule on whether Wal–Mart breached its duty to Hancock and whether Hancock was more than 50% at fault. Rather, I affirm because even when viewing the evidence in the light most favorable to Roddey, I find Wal–Mart was entitled to a directed verdict on the proximate cause element of Roddey's negligence action based on the unforeseeability of Jones' actions. *See Thomasko v. Poole,* 349 S.C. 7, 11, 561 S.E.2d 597, 599 (2002) (explaining that in reviewing a motion for directed verdict, the evidence is viewed in the light most favorable to the non-moving party). Wal–Mart argued:

This event . . . is about as classically unforeseeable as any event in the history of the law and there was simply no way

for anyone to foresee that Derrick Jones would pursue Ms. Hancock off of the premises of Wal–Mart in a high speed pursuit just because he was asked to get a license tag on the premises. So on the grounds that no negligence on the part of Wal–Mart, secondly on the ground that no negligence of Wal–Mart was the proximate cause, we would ask that the Court grant our motion for directed verdict as to Wal–Mart. . . .

The trial court ruled: "I do find that there is insufficient evidence that Wal–Mart was negligent, or even if they were[,] there is lack of proximate cause that the events were not foreseeable. . . ."

I agree with the trial court that Wal–Mart was entitled to directed verdict based on proximate cause. I conclude Roddey failed to establish legal cause sufficient to submit the question to the jury. "Proximate cause requires proof of both causation in fact and legal cause." *Small v. Pioneer Mach., Inc.,* 329 S.C. 448, 463, 494 S.E.2d 835, 842 (Ct.App.1997). "Legal cause is proved by establishing foreseeability." *Id.* The test of foreseeability is whether the injury is the natural and probable consequence of the alleged negligent act. *Koester v. Carolina Rental Ctr., Inc.,* 313 S.C. 490, 493, 443 S.E.2d 392, 394 (1994). "Where the injury complained of is not reasonably foreseeable there is no liability." *Crolley v. Hutchins,* 300 S.C. 355, 357, 387 S.E.2d 716, 717 (Ct.App. 1989). Where intervening acts occur, the original wrongdoer may be liable despite intervening acts if the intervening acts are foreseeable, or if not foreseeable, if the original wrongdoer's acts " 'would have caused the loss in natural course.' " *Young v. Tide Craft, Inc.,* 270 S.C. 453, 463, 242 S.E.2d 671, 676 (1978) (quoting *Benford v. Berkeley Heating Co.,* 258 S.C. 357, 365, 188 S.E.2d 841 (1972)).

I agree with the learned trial court that it was not foreseeable to Wal–Mart that Jones would leave the parking lot and continue pursuit for several miles while flashing his high-beams and aggressively following Hancock as she ran a stop sign and a stop light and drove onto a highway. I would affirm the trial court's finding that Wal–Mart was entitled to directed verdict based on the lack of foreseeability of Jones' actions. *See Stone v. Bethea,* 251 S.C. 157, 161–62, 161 S.E.2d 171, 173 (1968) ("One is not charged with foreseeing that

which is unpredictable or that which could not be expected to happen. When the [original wrongdoer's] negligence appears merely to have brought about a condition of affairs, or a situation in which another and entirely independent and efficient agency intervenes to cause the injury, the latter is to be deemed the direct or proximate cause, and the former only the indirect or remote cause."); *Dixon v. Besco Eng'g, Inc.*, 320 S.C. 174, 180, 463 S.E.2d 636, 640 (Ct.App.1995) ("For an intervening act to break the causal link and insulate the tortfeasor from further liability, the intervening act must be unforeseeable.").

HUFF, J., dissenting.

I respectfully dissent. While I agree with Chief Judge Few that there is evidence of Wal–Mart's negligence in this matter that was foreseeable, I do not agree that the jury's finding that Hancock was 65% negligent renders Hancock 65% negligent as a matter of law, and that this jury finding is binding on Roddey as to his cause of action against Wal–Mart, considering that Wal–Mart's negligence was not factored into the jury's determination. Further, I disagree with Judge Short's determination that Wal–Mart was entitled to a directed verdict because there was no proximate cause as a matter of law. Accordingly, I would reverse and remand for a new trial against Wal–Mart.

Travis A. Roddey, as the Personal Representative of the Estate of Alice Monique Beckham Hancock, brought this tort action against Wal–Mart Stores East, LP (Wal–Mart), U.S. Security Associates, Inc. (USSA), and Derrick L. Jones, stemming from Hancock's death following an alleged vehicular pursuit by private security guard Jones, an employee of USSA who was stationed at the Lancaster Wal–Mart. From an order of the trial court granting Wal–Mart a directed verdict, Roddey appeals.

## I. FACTUAL/PROCEDURAL BACKGROUND

The following facts are undisputed. On the night of June 20, 2006, Alice Monique Beckham Hancock and her sister, Donna Beckham, entered the Lancaster Wal–Mart together, but at some point Hancock returned to her car in the parking

lot, while Beckham remained inside the store. After Hancock left, Beckham selected some clothing with the intent to remove the items from the store without paying for them. One of Wal–Mart's Customer Service Managers, Hope Rawlings, observed Beckham placing items in a bag at a register where there was no cashier. Rawlings radioed Shaun Cox, another Customer Service manager on duty that night, asked Cox to come to the front of the store, and informed Cox about what she had observed.[5] Rawlings then approached both door greeters to instruct them to ask Beckham for a receipt, while Cox continued to observe Beckham. Cox pointed to Beckham for the store greeter, who then asked Beckham for her receipt. Beckham lied to the greeter, stating her sister had the receipt. Beckham then put the bag on the ground and walked out the door. During this time, as Rawlings reached the grocery door, she saw Derrick Jones in the security guard truck outside the door and walked outside to tell Jones about the shoplifter. As she did this, Cox radioed that Beckham was walking out the general merchandise door. There is varying witness testimony in regard to other matters, in particular between Jones and the two Wal–Mart employees, Rawlings and Cox, and between Jones and Beckham.

### Jones' Testimony

Jones testified that he received a call over the walkie-talkie that a shoplifter was leaving through the general merchandise door. Jones responded by asking what they wanted him to do, as he was a security officer, not a police officer, and he could not detain an individual. He was then instructed to delay the shoplifter, talking to her until someone could get out there. As the shoplifter walked in front of his truck, he asked how she was doing, and requested to talk to her. The woman responded that she first had to throw her bag in her car, but would be right back. When Jones told her she did not need to do that, and their conversation would only take a minute, the woman "took off running." The woman got in a car, and those in the car were trying to leave the parking lot, but Jones used his truck to intentionally block their exit, at which point they backed up their car. Jones stated he blocked the car because

---

5. Besides Jones, Rawlings, Cox, and Wal–Mart employee Chuck Campbell had walkie-talkies on them that night.

he had been instructed by Rawlings and Cox that he had to get the license plate tag number. He maintained "the way they [Wal–Mart employees] were coming off," if he did not get the tag number he could be fired. Jones stated that both Rawlings and Cox were asking him to get the tag number, and he felt a sense of urgency in the request. As the suspects fled in their car, Jones observed that they almost had an accident in the Wal–Mart parking lot, causing him to slow down, which in turn allowed cars to get between them. Jones stated it was not a "chase," and he was just trying to get the tag number. Jones acknowledged he knew he was not supposed to follow them out of the parking lot, but all he was being told was, "Look, you got to get this license plate tag number." He therefore felt he had to get the tag number, even if he had to leave the parking lot to do it, because "that's the way they came across." Jones testified it was like "we can care less whether you leave the parking lot or not. You need to get that license plate tag number." Jones again acknowledged that he should not have followed them out of the parking lot because he was not a policeman and he was not able to detain individuals, but he felt it was urgent that he obtain the tag number because of the way the Wal–Mart employees were "coming across." Jones testified, "And I'm on the walkie-talkie, telling them, I can't see this license plate tag number, and they're about to leave the parking lot. Man, well, you got to do what you got to do. You need to get that license plate number."

Once Hancock and Beckham left the parking lot, Jones observed a second near-accident between them and another car. According to Jones, he lost track of the women after they left the parking lot, but he continued to search for them in hopes of getting their tag number. Once he thought he had lost them, he turned his truck around. Thereafter, he saw headlights or hazard lights flashing and heard someone screaming for help. As he reached the car, he found the screaming passenger pinned by a chair, and the driver faintly breathing. Unable to get the passenger door open, Jones went to the road and stopped a passing motorist, who then called for help.

Jones again recognized he was wrong for leaving the parking lot and stated, "That was my mistake," indicating he made

that mistake due to the fact that he was being told, "Oh, you need that license plate tag number," and "Go get it." Jones agreed that Wal–Mart's instructions to him caused him to not think about "safety first," explaining that it happened so fast that he did not think clearly and stating as follows: "—when they're telling you, 'Look, man. You got to get that license plate tag. Yo—get that license plate tag.' And I'm telling them, 'Well, they leaving the parking lot'—'Well, get that license plate tag number.' And that's all I'm hearing." Jones agreed Cox and Rawlings never instructed him to leave the parking lot to get the tag number, but he testified as follows: "[T]hey did stress that I needed to get the license plate tag number after I told them, 'Well, look **we're—we're leaving the parking lot now.** You—well, you—you need to get that license plate number." (emphasis added). Jones testified the last communication he had with someone from Wal–Mart was as he was on a ramp heading toward a highway, less than a mile from Wal–Mart, with communication starting to break up then. The last clear conversation he had with them was as he was following behind Hancock and Beckham once they left the Wal–Mart parking lot.

### Beckham's Testimony

Beckham testified that as she walked out of Wal–Mart, Jones was in the security truck and screamed at her stating, "Hey, I need to talk to you." Beckham told him, "No, you don't," and started jogging to her sister's car. Jones "zoomed in on" them in his truck, and Beckham got in the back seat of Hancock's car. Jones pulled in front of them. As they went through the parking lot, Jones was "on [them]." Beckham was crouched down in the back seat, but periodically "popped up" to look, and observed Jones "flashing his high beams with the light on top," staying on them as if she had gone into Wal–Mart "with a gun." They left the parking lot, and drove a couple of miles before the accident occurred, during which time Jones was on their bumper. Right before the crash, Beckham heard and felt a bump, and they shot off the road to the left. Just before they ran off the road, she heard Hancock say, "He's still on our ass," and Beckham saw the high beams still flashing. According to Beckham, Hancock had no idea she was going to attempt to shoplift from the store.

### Rawlings' Testimony

Rawlings testified that her purpose in going to Jones and telling him about the shoplifter was for security for the door greeters who stopped the suspected person until management could arrive. Rawlings stated, before Cox came over the radio, she only told Jones that they had a shoplifter and she had seen the person putting items in a bag. She did not intend for her, or Jones, to stop or detain Beckham in any way, and denied that she asked Jones to approach or delay Beckham or even talk to Beckham. After Cox came over the radio, Jones went toward the general merchandise door, and Rawlings went back inside Wal–Mart from the grocery entrance and headed to the general merchandise door. As she reached the general merchandise door, she observed both Hancock and Jones run a stop sign and then run through a traffic light. Rawlings testified that she was "stunned" by this, and could not believe they left the parking lot. She did not expect Jones to leave the parking lot and continue to follow the car, nor did she ever tell Jones to pursue Hancock and Beckham. When asked if she could have radioed Jones and told him to stop, Rawlings stated, "It just all happened so fast and [Cox] was on the walkie trying to get Chuck up there and only one person can talk at a time on a walkie," such that someone would not be able to make use of it if another had the receiver pressed. Rawlings denied asking Jones to stop or delay the suspected shoplifter. As to the assertion Cox told Jones to obtain the license plate number of Hancock's car, Rawlings stated she remembered Cox stating, "Just get the tag number."

### Testimony of Cox

Cox testified that after the greeter spoke to Beckham, Beckham put down the bag, looked in her purse, said something to the greeter and then walked out the door. She and the door greeter did not chase or attempt to detain Beckham, and Cox did not ask Jones to stop or detain Beckham, to approach Beckham, to delay Beckham, or to even talk to Beckham. Cox walked toward the door after speaking to the greeter because she was curious to see what was going to happen. When Cox walked outside, she saw that Jones had pulled into the aisle, Beckham's car had come out in reverse, and the chase began. Beckham's car hit a median in the

parking lot, went backwards, she "flipped her car around" to face the proper direction, and they exited the parking lot. As soon as Cox saw Hancock's car turn to go the other direction, Cox stated, "Get her tag number." Cox testified she did not instruct Jones to get the tag number when his truck was in front of the other car, but only after the pursuit had begun. She also stated she only instructed Jones to get the tag number one time, and she did so because she did not know why Jones was chasing her and what had happened in the parking lot prior to that, and thought if he got the tag number when they left that the matter could be handled at a different time. Cox did not think Jones would leave the parking lot and was very surprised when he did. When asked if she could have told Jones to stop, Cox stated she could have, but it happened so fast that it did not occur to her, because she had never encountered such a situation, and she was "shocked and scared" and did not know what to do. She later clarified that she or Rawlings could have called Jones off of the pursuit if no one else was speaking on the radio at the time and if she was aware that Jones could still hear them over the radio by the time he reached the back of the building. Cox did not intend for Jones to follow the women out of the parking lot, but meant for Jones to stop, instructing Jones to "get her tag number."

### Plaintiff's Experts' Testimony

### 1. Jeff Gross

Jeff Gross, Roddey's expert witness in parking lot security, guard force management, and loss prevention, testified concerning Wal–Mart's policies and guidelines, and the breach of some of those in this situation. Specifically, Gross noted Wal–Mart's Guidelines for Private Security Contractors provide that it is the primary function of the private security contractor to provide customers with a safe shopping experience, and the basic security method consists of two parts: "The first, protection, enables the security contractor to protect persons and property by acting as a deterrent in order to prevent thefts, damages, or accidents. The second, communications, enables the security contractor to be a source of information to Wal–Mart management." The guidelines further provide that the security guard's "patrol vehicle should not leave Wal–

Mart property except for gas or maintenance," and it was Gross's opinion that provision was "clearly" violated in this case.[6] Gross also noted Wal–Mart's Investigation and Detention of Shoplifters Policy includes the following:

NEVER pursue a fleeing Suspect more than approximately 10 feet beyond the point you are located when the Suspect begins to run to avoid detention. Ten feet is about three long steps. This limitation applies both inside and outside the facility.

NEVER pursue a Suspect who is in a moving vehicle.

NEVER pursue a Suspect off the Facility's property.

NEVER use a moving vehicle to pursue a Suspect.

TERMINATE the pursuit of a Suspect, if the Suspect begins to enter a vehicle.[7]

Gross testified that in his opinion, to a reasonable degree of certainty, these policies were violated. When asked who broke these rules, he replied that USSA, Jones, and "through tacit approval Wal–Mart," as Wal–Mart did not "do anything to stop [Jones]," but instructed him to get the license plate number, giving him no other direction or guidance. When asked whether he had an opinion to a reasonable degree of certainty about whether Wal–Mart's failure to ask Jones to stop the chase was a breach of safety rules, Gross opined that it "increased the risks dramatically," noting if Jones had not

---

**6.** The Guidelines themselves are in the record and include the following provisions, "At no time should you try to apprehend, or use your vehicle to apprehend any suspects; ... Security Contractors are not a policing force and should not be used as one. It's Wal–Mart management's responsibility to enforce Wal–Mart policies and procedures; ... In the event of a shoplifter situation, the security contractor should act as a witness, and only assist when directed to by a member of Wal–Mart management or Loss Prevention, or when you see the Wal–Mart associate in trouble or danger; ... Remember, Security Contractors are precluded from searching or pursuing suspects, etc."

**7.** Wal–Mart's Shoplifters Policy further specifically indicates that only certain authorized associates are allowed to surveil, investigate or detain a suspected shoplifter and may do so only in the presence of another Associate. This policy also emphasizes, reiterating often, that the authorized associate must let the suspect go rather than continue a pursuit that is "likely to injure or cause harm to someone," and that the authorized associate should terminate the pursuit of a suspect if the suspect begins to enter a vehicle.

gone after them, they would not have sped away. Gross stated, "the very headwaters of this problem starts (sic) with them not following their own policies ... asking [Jones] to do something that Wal–Mart specifically says they won't do themselves and they don't want their contractors to do." Asked if he had an opinion whether Wal–Mart, as a major retailer, knew about what could happen if something escalated, Gross opined Wal–Mart would have known based upon Wal–Mart's policies regarding "not chasing," and "about merchandise not being worth an employee being injured." Gross noted Wal–Mart had identified the results of doing certain things to the point that Wal–Mart was specific about not wanting those things to be done. Asked if he had an opinion about whether Wal–Mart violated its own policy by escalating the situation he stated, "They caused it to escalate ... by telling [Jones] to do something their policy says you don't do. They won't allow their own people to do this but they instructed him to do it."

On cross-examination, Gross agreed he had no problem with anything Wal–Mart did within the store that evening relating to this matter, but only questioned Wal–Mart's (1) decision to ask Jones to get the license tag and (2) failure to call Jones back once he pursued Hancock off the premises. Gross further agreed that it was okay to ask a security officer in the parking lot to observe and report a license tag if it could be done without extraordinary effort, and he had no problem with Jones getting the tag number in the parking lot had he not pursued the vehicle, if it was done in a safe fashion. However, it was not reasonable when done the way Jones did it. When asked about the Wal–Mart employees' failure to call Jones back and the fact that the parking lot incident lasted about thirty to forty seconds, Gross maintained they could have used the radio to communicate with Jones and the employee had enough time to process the information when she watched Jones leave the property, but she did nothing. He further noted that there was testimony indicating the range of the walkie-talkies was sufficient for communication off of the property.

## 2. Jeffrey Albert

Roddey also presented the testimony of Jeffrey Albert, who was qualified as an expert in the field of pursuit and the

behavior of people being pursued. Albert was of the opinion that the pursuit started in the Wal–Mart parking lot once Jones "continued to follow, continued to go after Beckham," and lasted until the crash. He characterized Jones' actions as reckless, raising the risks beyond what was reasonably necessary. Albert also testified that he had performed studies on the actions of people being pursued and found there is a pattern where fleeing drivers tend to look behind them in order to observe what the pursuing person is doing, and a fleeing driver, who is going faster, may also be distracted by flashing lights. Albert opined that Jones "clearly ... violated every rule in the book ... by leaving the parking lot and going after the car against policy, against common sense, against training, against what he was told and raising the risk ... to ... certainly the driver and passenger in the car." When asked his opinion of whether these improper actions contributed to the crash, Albert testified, "In the sense that had he done what he should have done, stayed in the parking lot, not gone after her it's highly unlikely that that crash would have taken place." Albert agreed he had no problem with Wal–Mart trying to obtain the license tag number of the vehicle while in the parking lot, assuming there was no pursuit involved. He also acknowledged there was conflicting evidence of whether there was a continued pursuit until the accident.

### Other Testimony and Evidence

### 1. Samuel Plyler

Samuel Plyler, a volunteer firefighter who lived close to the scene of the accident and arrived at the accident site within minutes of dispatch, testified he observed a gentleman in a security officer uniform at the scene. This person was saying "they need help and I got myself in a situation." Notably, when Plyler turned around, he observed this person writing down the tag number of the car.

### 2. Chris Tipton

Chris Tipton [8] testified that Wal–Mart contracted with an independent company to provide security services to the store,

---

8. It is not clear from the record who Tipton is and what his relationship is to this matter, but it appears he is a higher-level representative for

and that company was responsible for those security services. However, he acknowledged that, while on Wal–Mart premises, Wal–Mart had a limited right to have the security company employee perform some tasks, and Wal–Mart policy provided that the security company employee could "assist as requested." Tipton agreed that under Wal–Mart's loss prevention policy, because Beckham did not take any merchandise out of the store, Wal–Mart would not pursue a shoplifting prosecution against her, even though the law would have allowed such. Tipton explained the reason behind the policy to be that Wal–Mart wanted to give the customer the benefit of the doubt and did not want to "cause any risk for anybody," and acknowledged consideration of the balance between the store not losing any merchandise in such a situation versus the risk attendant to apprehending a shoplifter. Tipton felt there was nothing wrong with Cox asking Jones to obtain the tag number of Hancock's vehicle as she was attempting to leave the parking lot, if Jones could have done so while in the parking lot. He further testified he saw no evidence that any Wal–Mart employee did anything in violation of Wal–Mart policies, and found no fault in the failure of Wal–Mart employees to tell Jones to stop and come back, stating he did not believe the walkie-talkies range would have enabled them to do so, as they often had problems with the walkie-talkies inside the store. Additionally, he noted that the walkie-talkies only allowed one person to speak over them at a time.

## II. MOTION FOR DIRECTED VERDICT

At the conclusion of Roddey's case, Wal–Mart moved for a directed verdict asserting, among other things, that there was no negligence on the part of Wal–Mart and there was no evidence any negligence on the part of Wal–Mart was the proximate cause of the accident. The trial court agreed, finding there was "insufficient evidence that Wal–Mart was negligent, or even if there were, there [was a] lack of proximate cause [in] that the events were not foreseeable." The court therefore granted Wal–Mart's motion for directed verdict and dismissed Wal–Mart from the lawsuit. The case proceeded against USSA and Jones, and the jury returned a

---

Wal–Mart, with knowledge of employment matters and Wal–Mart policy.

special verdict form finding defendants USSA and Jones negligent and that their negligence proximately caused the injury, but likewise found Hancock negligent and that her negligence was a proximate cause of the injury. Taking the combined negligence that proximately caused the injury as one hundred percent, the jury determined the defendants, USSA and Jones, were thirty-five percent negligent, while Hancock was sixty-five percent negligent. The jury also determined USSA was negligent in hiring, training, supervision and retention, but found this negligence was not the proximate cause of the injury. Because the jury found Hancock's percentage on negligence to be greater than fifty percent, the jury did not make a determination as to the amount of damages.

## III. STANDARD OF REVIEW

"When upon a trial the case presents only questions of law the judge may direct a verdict." Rule 50(a), SCRCP. In ruling on a motion for directed verdict, a trial court must view the evidence and all reasonable inferences in the light most favorable to the non-moving party. *S.C. Fed. Credit Union v. Higgins*, 394 S.C. 189, 193–94, 714 S.E.2d 550, 552 (2011). A trial court must deny a motion for directed verdict where either the evidence yields more than one inference or its inference is in doubt. *Law v. S.C. Dep't of Corr.*, 368 S.C. 424, 434, 629 S.E.2d 642, 648 (2006). "A motion for a directed verdict goes to the entire case and may be granted only when the evidence raises no issue for the jury as to liability." *Hartfield v. Getaway Lounge & Grill, Inc.*, 388 S.C. 407, 415, 697 S.E.2d 558, 562 (2010). The trial court should be concerned only with the existence or nonexistence of evidence, and not with the credibility or weight of the evidence. *Higgins*, 394 S.C. at 194, 714 S.E.2d at 552. Our standard of review likewise requires this court to view the evidence in a light most favorable to the non-moving party. *Id.*

Additionally, "[t]he question of proximate cause ordinarily is one of fact for the jury, and it may be resolved either by direct or circumstantial evidence." *Madison ex rel. Bryant v. Babcock Center, Inc.*, 371 S.C. 123, 147, 638 S.E.2d 650, 662 (2006). "The trial judge's sole function regarding the issue is to

inquire whether particular conclusions are the only reasonable inferences that can be drawn from the evidence." *Id.*

## IV. RODDEY'S APPELLATE ARGUMENTS

Roddey contends the trial court erred in granting Wal–Mart a directed verdict on the issue of both negligence and proximate cause. He asserts there was evidence presented that Wal–Mart employees were negligent in bringing Jones into the encounter, instructing Jones to delay the women and obtain their license tag number, and instructing Jones to get the tag number after Jones warned the Wal–Mart employees about their exit from the parking lot. Roddey further maintains that a reasonable jury could find from the evidence presented that the accident would not have occurred had Wal–Mart not given Jones those instructions, and that a serious injury was a foreseeable consequence of Wal–Mart's request that Jones engage in this task. Specifically, Roddey notes there is evidence Wal–Mart breached its duty of care by violating its own policies regarding who could pursue a suspected shoplifter and under what circumstances the pursuit could begin and those under which pursuit must be terminated. Additionally, Roddey notes there was evidence of Wal–Mart's negligence in instructing Jones to continue to get the vehicle tag number even though it meant a vehicular pursuit on a public street.

Roddey also argues there is evidence presented from which a reasonable jury could determine that Hancock's injury would not have occurred "but for" Wal–Mart's conduct in instructing and encouraging Jones in the pursuit. Further, Roddey contends, given the evidence that Wal–Mart violated its restrictive policy and engaged Jones in the situation, Wal–Mart should have reasonably foreseen that instructing Jones as it did would result in injury to a shoplifter or customer. He points to evidence that (1) Wal–Mart gave Jones instructions causing him to drive through the Wal–Mart parking lot after someone who was running to get into a moving vehicle, (2) Wal–Mart employees saw this unfold, instructed Jones to interact with the women and failed to stop him, and (3) Wal–Mart instructed Jones to continue to get the tag number even though it meant a vehicular pursuit on the public street. Roddey also notes this case is not one involving an indepen-

dent, intervening act of a third party that broke the causal chain, and asserts the law provides that if the acts of the intervening agency are a probable consequence of the primary wrongdoer's actions, the primary wrongdoer is liable.

Lastly, Roddey asserts the trial court's error in granting Wal–Mart a directed verdict requires a new trial, not just as to Wal–Mart, but as to USSA and Jones as well. He argues, under South Carolina's comparative negligence law, a plaintiff may only recover damages in a negligence action if his or her negligence is not greater than that of the defendant or the combined defendants, and the amount of a plaintiff's recovery is reduced in proportion to his or her negligence. Because the jury only had the opportunity to compare the negligence of Hancock to that of USSA and Jones, Roddey argues the comparative negligence of Hancock may have been less than that of the three defendants had Wal–Mart's negligence been considered, in which case recovery of damages would have been possible.

## V. ANALYSIS

### Negligence and Proximate Cause

As to Judge Short's concurring opinion, I believe the issues of Wal–Mart's negligence and proximate cause should have been submitted to the jury. Though there is admittedly evidence from which a jury could find that Wal–Mart was not negligent, or if it was, Wal–Mart's negligence was not reasonably foreseeable, I find there is evidence from which a reasonable jury could determine that Wal–Mart was negligent and that negligence proximately caused the injuries incurred. Thus, viewing the evidence in a light most favorable to Roddey, the evidence yields more than one inference, or its inferences are in doubt, and both matters should have been submitted to the jury.

In order to prove a cause of action for negligence, a plaintiff must show that (1) the defendant owes a duty of care to the plaintiff, (2) the defendant breached that duty by a negligent act or omission, (3) the defendant's breach was the actual and proximate cause of the plaintiff's injury, and (4) the plaintiff suffered an injury or damages. *Madison*, 371 S.C. at 135, 638 S.E.2d at 656. In the case at hand, the trial court directed a

verdict based upon its determination that there was insufficient evidence of negligence on the part of Wal–Mart, and even if there were sufficient evidence of negligence, there was insufficient evidence that any such negligence was the proximate cause of the accident, as the events were not foreseeable.

### 1. Negligence

In regard to negligence, our law provides that "[t]he factfinder may consider relevant standards of care from various sources in determining whether a defendant breached a duty owed to an injured person in a negligence case." *Id.* at 140, 638 S.E.2d at 659. "The standard of care in a given case may be established and defined by the common law, statutes, administrative regulations, industry standards, or a defendant's own policies and guidelines." *Id.* Evidence of a company's deviation from their own internal policies is relevant to show the company deviated from that standard of care, and is properly admitted to show the element of breach. *Peterson v. Nat'l R.R. Passenger Corp.*, 365 S.C. 391, 397, 618 S.E.2d 903, 906 (2005). *See also Caldwell v. K–Mart Corp.*, 306 S.C. 27, 31, 410 S.E.2d 21, 24 (Ct.App.1991) (holding K–Mart's loss prevention manual was relevant on the material issue of the reasonableness of K–Mart's actions, noting, in negligence cases, internal policies or self-imposed rules are often admissible as relevant on the issue of failure to exercise due care). Relevant rules promulgated by a defendant company are admissible in evidence in a personal injury action, regardless of whether the rules were intended primarily for employee guidance, public safety, or both, because violation of such rules may constitute evidence of a breach of the duty of care and the proximate cause of injury. *Madison*, 371 at 141, 638 S.E.2d at 659 (citing *Tidwell v. Columbia Ry., Gas & Elec. Co.*, 109 S.C. 34, 95 S.E. 109 (1918)).

Here, viewed in the light most favorable to Roddey, there is evidence from which the jury could determine that Wal–Mart employees violated their own policies by instructing Jones to engage in actions prohibited by both their Guidelines for Private Security Contractors, as well as Wal–Mart's Investigation and Detention of Shoplifters Policy for employees. While a jury could very well conclude, based upon the evidence presented, that Wal–Mart employees merely requested Jones

speak with Beckham and simply made a singular request for Jones to obtain the tag number of Hancock's vehicle while he was safely in a position to do so, and these actions were permitted by Wal–Mart's guidelines and policies,[9] there was evidence presented from which a jury could also reasonably conclude Wal–Mart was negligent in deviating from its guidelines and policies in this instance. Specifically, Guidelines for Private Security Contractors prohibit the use of contracted security guards as a policing force, and note it is the responsibility of Wal–Mart management to enforce Wal–Mart policies and procedures. Further, these guidelines provide that security contractors are precluded from pursuing suspects, prohibit security contractors from using their vehicle in an attempt to apprehend any suspects, and only allow the patrol vehicle to leave Wal–Mart property for obtaining gas or maintenance for the vehicle. Additionally, the Investigation and Detention of Shoplifters Policy provides employees themselves are, at all times, prohibited from pursuing a fleeing suspect more than approximately 10 feet both inside and outside the facility, pursuing a suspect who is in a moving vehicle, pursuing a suspect off Wal–Mart's property, and using a moving vehicle to pursue a suspect. Further, employees are directed to terminate the pursuit of a suspect if the suspect begins to enter a vehicle. There is evidence from which a jury could reasonably conclude that Wal–Mart employees directed Jones, on more than one occasion, to obtain Hancock's tag number, that they did so while observing Jones pursue Beckham and Hancock in his patrol vehicle, and they observed the reckless driving of Hancock and Jones in the parking lot, *yet they continued to instruct Jones to obtain the tag number after Jones warned, not just that the women were leaving the parking lot, but that he and the women were leaving the parking lot.* Thus, there is evidence from which a jury could reasonably conclude that Wal–Mart employees acquiesced in, and possibly instructed, Jones' improper pursuit of the women in violation of the Private Security Contractors guidelines. Additionally, as noted by Roddey's expert witness, Gross, there is evidence from which a jury could find Wal–Mart

---

9. In particular, we note the guidelines provide the security contractor may act as a witness, and is allowed to assist when directed to do so by a member of Wal–Mart management or Loss Prevention.

employees instructed Jones to do something their policy strictly prohibited the employees themselves from doing. Accordingly, there is sufficient evidence of Wal–Mart's negligence such that the matter was a question for the jury.

## 2. Proximate Cause

In order to prove proximate cause, a plaintiff is required to show both causation in fact and legal cause. *Madison,* 371 S.C. at 146, 638 S.E.2d at 662. Causation in fact is proved by establishing the injury would not have occurred "but for" the defendant's negligence, while legal cause is proved by establishing foreseeability. *Id.* at 147, 638 S.E.2d at 662. "Foreseeability is determined by looking to the natural and probable consequences of the complained of act, although it is not necessary to prove that a particular event or injury was foreseeable." *Id.* Further, "[t]he defendant's negligence does not have to be the sole proximate cause of the plaintiff's injury; instead, the plaintiff must prove the defendant's negligence was at least one of the proximate causes of the injury." *Id.*

> Instead, it is sufficient if the evidence establishes that the defendant's negligence is a concurring or a contributing proximate cause. Concurring causes operate contemporaneously to produce the injury, so that it would not have happened in the absence of either. In other words, if the actor's conduct is a substantial factor in the harm to another, the fact that he neither foresaw nor should have foreseen the extent of harm or the manner in which it occurred does not negative his liability.

*J.T. Baggerly v. CSX Transp., Inc.,* 370 S.C. 362, 369, 635 S.E.2d 97, 101 (2006) (citations, quotations, and emphasis in original omitted). An injury is considered foreseeable "if it is the natural and probable consequence of a breach of duty." *Hurd v. Williamsburg Cnty.,* 363 S.C. 421, 428, 611 S.E.2d 488, 492 (2005).

A primary wrongdoer's action "is a legal cause of an injury if either the intervening act or the injury itself was foreseeable as a natural and probable consequence of that action." *Bramlette v. Charter–Med.–Columbia,* 302 S.C. 68, 73, 393 S.E.2d 914, 917 (1990). Though an intervening force may be a su-

perseding cause that relieves an actor from liability, in order for there to be relief from liability on this basis, that intervening cause must be one that could not have been reasonably foreseen or anticipated. *Rife v. Hitachi Const. Mach. Co., Ltd.,* 363 S.C. 209, 217, 609 S.E.2d 565, 569 (Ct.App.2005). "For an intervening act to break the causal link and insulate the tortfeasor from further liability, the intervening act must be unforeseeable." *Dixon v. Besco Eng'g, Inc.,* 320 S.C. 174, 180, 463 S.E.2d 636, 640 (Ct.App.1995). "The intervening negligence of a third person will not excuse the first wrongdoer if such intervention ought to have been foreseen in the exercise of due care. In such case, the original negligence still remains active, and a contributing cause of the injury." *Bishop v. S.C. Dep't of Mental Health,* 331 S.C. 79, 89, 502 S.E.2d 78, 83 (1998). The test for determining if the negligent conduct of the original wrongdoer is to be insulated, as a matter of law, "by the independent negligent conduct of another is whether the intervening act and the injury resulting therefrom are of such character that the author of the primary negligence should have reasonably foreseen and anticipated them in light of the attendant circumstances." *Id.* One is not charged with foreseeing that which is unpredictable or which could not be expected to happen, and, thus, when it appears the negligence merely "brought about a condition of affairs, or a situation in which another and *entirely independent and efficient agency* intervenes to cause the injury, the latter is to be deemed the direct or proximate cause, and the former only the indirect or remote cause." *Stone v. Bethea,* 251 S.C. 157, 161–62, 161 S.E.2d 171, 173 (1968) (emphasis added). The final result of a wrongful act, as well as every intermediate cause, will be considered to be the proximate result of the first wrongful cause if intervening acts are set in motion by the original wrongful act and are normal and foreseeable results of the original act. *Wallace v. Owens–Illinois, Inc.,* 300 S.C. 518, 521, 389 S.E.2d 155, 157 (Ct.App.1989).

Here, there was evidence presented that, despite Wal–Mart's knowledge of the aggressive and reckless driving manners of Hancock and Jones and in spite of being advised both vehicles were leaving the property, Wal–Mart continued to instruct Jones to obtain the tag number. Notably, Roddey's expert witness in the area of pursuit, Albert, testified concern-

ing the effects of vehicular pursuit on those being pursued, and specifically opined that had Jones stayed in the parking lot and not pursued Hancock's vehicle, it was highly unlikely the crash would have taken place. Thus, there is evidence that "but for" these actions by Wal–Mart, the accident would not have occurred.

With respect to foreseeability, there was evidence presented that the accident was a foreseeable consequence of Wal–Mart's instructions to Jones, which were in violation of Wal–Mart's established policies and guidelines, such that the matter should have been submitted to the jury. As noted, there was evidence presented that (1) Wal–Mart gave Jones instructions causing him to drive through the Wal–Mart parking lot after Beckham, who then got into a moving vehicle, and Jones then pursued Hancock's moving vehicle in his patrol car, (2) Wal–Mart employees directed Jones, on more than one occasion, to obtain Hancock's tag number, while observing Jones pursue Beckham and Hancock in his patrol vehicle, with both vehicles being operated in aggressive and/or reckless manners, and (3) Wal–Mart continued to instruct Jones to get the tag number even after Jones informed them that he and the women were leaving the parking lot, thus encouraging a vehicular pursuit on the public street. Additionally, Wal–Mart's Shoplifters Policy specifically indicates that only certain authorized associates are allowed to investigate or detain a suspected shoplifter and may do so only in the presence of another associate, and their policy emphasizes and reiterates that the authorized associate must let the suspect go rather than continue a pursuit that is "likely to injure or cause harm to someone." Additionally, Roddey provided evidence, through expert testimony, that Wal–Mart had identified the results of "doing certain things," knew what could happen in such a situation, and as a result, adopted policies against them. Accordingly, there is evidence that the accident was a natural and probable consequence of Wal–Mart's negligent actions and therefore was reasonably foreseeable.

Additionally, I do not believe, considered in a light most favorable to Roddey, that as a matter of law Jones' actions were independent intervening acts which could not have been foreseen by Wal–Mart, or that Wal–Mart's acts were only a remote cause that did nothing more than furnish the condition

or give rise to the occasion by which the injury was made possible, as there is evidence from which a jury could reasonably conclude Jones' acts were not "an entirely independent and efficient agency" and were not "a distinct, successive, unrelated and efficient cause of the injury." *See Stone*, 251 S.C. at 162, 161 S.E.2d at 173 (noting, when it appears one's negligence merely brought about a condition of affairs, or a situation in which another and entirely independent and efficient agency intervenes to cause the injury, the latter is to be deemed the direct or proximate cause, and the former only the indirect or remote cause); *Driggers v. City of Florence*, 190 S.C. 309, 313, 2 S.E.2d 790, 791 (1939) ("A prior and remote cause cannot be made the basis of an action if such remote cause did nothing more than furnish the condition or give rise to the occasion by which the injury was made possible, if there intervened between such prior or remote cause and the injury a distinct, successive, unrelated and efficient cause of the injury, even though such injury would not have happened but for such condition or occasion."). Clearly, there is evidence that any intervening acts of Jones were set in motion by the original wrongful acts of Wal–Mart and were the normal and foreseeable results of the original act. *Wallace*, 300 S.C. at 521, 389 S.E.2d at 157

### Jury finding as to Hancock's negligence

As to Chief Judge Few's majority opinion, I do not believe that Wal–Mart's liability in this matter is strictly derivative of Jones' and/or USSA's liability such that the jury's finding that Jones was only 35% at fault foreclosed any additional liability on the part of Wal–Mart. While this may very well be true in regard to allegations of vicarious liability, as noted by Chief Judge Few, Roddey also alleged Wal–Mart was liable based upon its failure to properly supervise Jones, and Wal–Mart's improper advice or instruction to Jones to follow Hancock and obtain her license tag information. Thus, while a jury could very well find Hancock was still 65% negligent after considering Wal–Mart's potential liability, it could conceivably find, after factoring in any negligence by Wal–Mart, that Hancock was less than 50% at fault. I believe this is a question for the jury, and do not believe this court should invade such province of the jury. Accordingly, I would reverse the directed verdict

in favor of Wal–Mart and remand for a new trial as to Wal–Mart alone.[10]

10. As to Roddey's assertion on appeal that the trial court's error in granting Wal–Mart a directed verdict requires a new trial as to all of the respondents, I would find Roddey has abandoned this issue on appeal and, additionally, we need not consider the argument based on Roddey's failure to set forth the argument in his statement of the issues on appeal. Though he cites law concerning the effect of a jury finding of comparative negligence on a plaintiff's ultimate ability to collect damages, he provides no supporting authority for his assertion that a court may require a new trial against defendants against whom a verdict has already been found and who are not then held responsible for damages based upon the jury's finding as to the relative percentages of negligence assigned to the various parties. Because Roddey fails to cite law that would allow this court to grant a new trial against a defendant who has not received any type of favorable ruling that was in error, I believe the argument is abandoned. *See First Sav. Bank v. McLean*, 314 S.C. 361, 363, 444 S.E.2d 513, 514 (1994) (noting when a party fails to cite authority or when the argument is simply a conclusory statement, the party is deemed to have abandoned the issue on appeal); *Eaddy v. Smurfit–Stone Container Corp.*, 355 S.C. 154, 164, 584 S.E.2d 390, 396 (Ct.App.2003) ("[S]hort, conclusory statements made without supporting authority are deemed abandoned on appeal and therefore not preserved for our review."). Additionally, Roddey failed to set forth the argument in his statement of the issues on appeal. Therefore, the court need not consider it. *See* Rule 208(b)(1)(B), SCACR ("Ordinarily, no point will be considered which is not set forth in the statement of the issues on appeal.").